NED MARYOTT, APPELLEE, V. OCONTO CATTLE CO.,
A LIMITED PARTNERSHIP, ET AL., APPELLEES,
AND FARM CREDIT SERVICES OF THE
MIDLANDS, PCA, INTERVENOR-APPELLANT.
607 N.W. 2d 820

Filed March 24, 2000.   No. S-98-977.

Kirk S. Blecha and Mary Leiter Swick, of Baird, Holm, McEachen, Pedersen, Hamann & Strasheim, for intervenor-appellant Farm Credit Services of the Midlands, PCA.

David E. Copple and Sara E. Miller, of Copple & Rockey, P.C., for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

This case presents the following question: Under the Nebraska Uniform Commercial Code, is the interest of an unpaid cash seller in goods, already delivered to a buyer, superior or subordinate to the interest of a holder of a perfected security interest in those same goods?

The appellee, Ned Maryott, delivered cattle to Oconto Cattle Company, a limited partnership (Oconto), and was given two sight drafts drawn from lines of credit extended by the appellant, Farm Credit Services of the Midlands, PCA (Farm Credit).

Before the drafts were presented for payment, Farm Credit declared the loans in default and refused payment on the drafts. Farm Credit held perfected security interests in cattle acquired by Oconto.

Maryott brought a replevin action against Oconto seeking return of the cattle, and Farm Credit intervened. The district court held that Maryott had a superior interest in the cattle and entered judgment in his favor. Farm Credit appeals, contending that regardless of whether Maryott retained title when he delivered the cattle to Oconto, all Maryott retained was a security interest in the cattle, which he failed to perfect. We conclude that under the Nebraska Uniform Commercial Code, an unpaid seller who reserves title in goods sold retains a security interest in the goods that, if perfected, will give the seller priority over creditors of the buyers. Because Maryott did not perfect his security interest as required by Neb. U.C.C. §§ 9-107 (Reissue 1992) and 9-312 (Cum. Supp. 1996), we conclude that Farm Credit has priority. Accordingly, we reverse.

## BACKGROUND

Farm Credit is composed of a production credit association (PCA) and a federal land credit association (FLCA). PCA makes operational loans secured by chattels, and FLCA makes longer term loans secured by real property. Oconto, a Nebraska limited partnership, owned a commercial cattle feedlot. At all relevant times, Warren E. Bierman, as general partner, operated the feedlot. Oconto's business included buying and selling cattle in its own name, custom feeding and marketing of cattle owned by others, and custom feeding and marketing of cattle purchased by others for which purchases Oconto supplied the financing.

Farm Credit was Oconto's lender. That relationship began in 1995 with the execution of several promissory notes. On July 25, 1996, the notes were renewed. At that time, two different notes provided Oconto with a line of credit up to $3,000,000 on each note. All notes were secured and cross-collateralized by security interests granted by Oconto in a security agreement and trust deed. The security agreement included in its description of collateral all livestock and inventory then owned by Oconto and

thereafter acquired. The security agreement stated that the collateral secured all future and additional loans made to Oconto by Farm Credit.

Farm Credit's security interests were duly perfected by a financing statement filed with the Custer County clerk on June 1, 1995, and the Nebraska Secretary of State on June 5, and by a Nebraska effective financing statement filed with the Custer County register of deeds on June 1. The rights and obligations of Farm Credit and Oconto were contained in the promissory notes, security agreements, and trust deed described above, along with a loan agreement and several loan addendums (collectively the loan documents).

On and after July 25, 1996, under the loan documents, Farm Credit at its option could advance funds to Oconto under the line of credit loans to a maximum of $3,000,000 for each note. However, all advances were conditioned upon Oconto's being in compliance with the terms and conditions of the loan documents, including a borrowing base formula. The borrowing base formula, among other things, required Oconto to report monthly to Farm Credit. Such reports enabled Farm Credit to compute the ratio of debt to collateral. At the time of trial, Farm Credit had a nondischargeable judgment against Bierman.

For over 20 years, Maryott, a resident of Britton, South Dakota, sold cattle either to Bierman, individually, or to Oconto through Bierman. Maryott's practice was to deliver cattle by truck to the feedlot and present invoices for the cattle to Bierman or other feedlot personnel. Approximately 25 percent of the time, Maryott was paid immediately upon delivery of the cattle. Otherwise, Oconto would pay Maryott 2 to 3 weeks after delivery. In the industry, Oconto had the reputation of being a slow-pay client. With the exception of the cattle at issue, Oconto eventually paid Maryott for the cattle delivered.

When Maryott delivered cattle to Oconto, he did not restrict Oconto's ability to sell the cattle to others. He did not instruct Oconto regarding how to pen the cattle, how to feed or care for the cattle, or where, when, or at what price to sell the cattle. If cattle died after delivery but before Maryott received payment, the loss was born by Oconto.

Oconto paid Maryott for cattle with Farm Credit sight drafts payable through Norwest Bank Nebraska, N.A. The sight drafts were drawn on the lines of credit that Farm Credit had extended to Oconto under the loan documents. The loan documents provided that each sight draft that was honored by Farm Credit constituted an extension of credit to Oconto. Under the loan documents, Farm Credit had an absolute right to instruct Norwest not to honor a sight draft. Norwest would provide Farm Credit daily with a list of drafts presented for payment and obtain authorization from Farm Credit before payment. This form of payment is the customary method by which Farm Credit extends credit to borrowers with lines of credit.

From July 16 through August 29, 1996, Maryott, in several different deliveries, delivered 640 head of cattle to the feedlot. Although Oconto did not pay Maryott after each delivery, he continued to deliver cattle.

Maryott first learned there was a problem when two Farm Credit sight drafts dated August 26 and 28, 1996, issued by Oconto in partial payment for the cattle, were dishonored. Maryott called Bierman, who told Maryott to send the drafts through again. When Maryott did so, the drafts were dishonored a second time. Maryott called Bierman and was reassured that he would be paid. Maryott did not call or visit Farm Credit to inquire about the drafts until approximately September 19 or 23.

The reason for the dishonor was that on August 30, 1996, Farm Credit had declared Oconto in default of the loan documents and canceled Oconto's lines of credit. The lines were canceled because it appeared that Bierman had been double counting some receivables and that he was not in compliance with the borrowing base formula. There was also evidence of a check-kiting scheme. When Bierman failed to provide a satisfactory explanation, Farm Credit declared the Oconto loans to be in default and refused to extend any further credit with the exception of making some protective advances. At the time of Oconto's default, its indebtedness to Farm Credit was well in excess of the value of the cattle. The protective advances were made to cover costs in keeping up the feedlot and to ensure that cattle remaining on the lot were cared for until sold. Oconto subsequently filed bankruptcy.

Maryott came to the feedlot on September 23, 1996, inspected the cattle, and met with a Farm Credit representative, who did not allow him to take any of the cattle. Following a review of the records regarding the cattle, Farm Credit determined that Maryott could not prove a superior ownership and that there would likely be a dispute over it. However, there is some dispute in the record regarding whether a representative of Farm Credit told Maryott that "maybe" he would get either money or the cattle back.

Maryott subsequently filed a replevin action against Oconto, Bierman, and Bierman's wife, seeking a return of the cattle, and Maryott was granted relief from the automatic stay by the bankruptcy court. Farm Credit intervened. In both his petition and answer to Farm Credit's petition in intervention, Maryott alleged that as the owner of the cattle, he had a security interest in them. Maryott did not allege in his petition or answer to Farm Credit's petition in intervention that Farm Credit acted in bad faith. However, the court denied a motion for summary judgment on the basis that questions of fact remained regarding whether title to the cattle passed to Oconto upon delivery and whether Farm Credit acted in good faith when it stopped payment on the drafts.

At trial, Maryott contended that it was the industry standard that title would not pass until the seller of the cattle had been paid. As evidence of this, Maryott called three witnesses: a friend and neighbor of Maryott, a person who had a longstanding business relationship with Maryott, and a customer of Oconto who was in the same position as Maryott in relation to Oconto. The witnesses testified that the practice in the industry was that the buyer would not receive any rights in cattle until the seller was paid and that if there was no payment, the seller had the right to pick up the cattle.

Evidence introduced at trial indicated that Maryott was familiar with cattle financing and had given lenders, including Oconto, security interests in cattle as collateral for loans. Maryott did not require Oconto to execute any security documents in his favor with respect to the cattle, did not file any financing statement with respect to the cattle, did not check Oconto's credit record, and did not check county and state

records for any security interests which might be claimed on Oconto's property. The record indicates that Farm Credit did not inquire about cattle delivered prior to declaring Oconto's loans in default. The record also reflects that Farm Credit did not know about Maryott's outstanding claim at the time it made the decision to cease extending credit under the loans. Farm Credit did not inquire about what the dishonored drafts were for when it refused to extend further credit.

The trial court concluded that Maryott and Oconto had established a course of business and custom that created an express agreement that a sale of cattle would not be complete until payment was made. The court also concluded that Maryott had a "special ownership or interest" in the cattle. The court then determined that Farm Credit had notice of Oconto's conduct in acquiring the cattle without payment, but that Farm Credit did not have a malicious motive in seizing the cattle. In addition, the court determined that Farm Credit's security interest did not attach to the cattle and that it did not advance funds for purchase of the cattle or change its financial position with respect to the cattle. As a result, the court entered a judgment in the amount of $348,479.94 for the value of the cattle and dismissed Farm Credit's petition in intervention with prejudice. Farm Credit appeals.

## ASSIGNMENTS OF ERROR

Farm Credit assigns that the trial court erred in determining that (1) title to the cattle did not pass to Oconto, (2) Farm Credit's security interest did not attach to the cattle, (3) Maryott had a superior interest in the cattle, and (4) Maryott was the real party in interest.

## STANDARD OF REVIEW

An action under the Uniform Commercial Code is one at law. *Ford Motor Credit Co. v. All Ways, Inc.*, 249 Neb. 923, 546 N.W.2d 807 (1996). On a question of law, an appellate court is obligated to reach a conclusion independent of the determination reached by the court below. *Spulak v. Tower Ins. Co.*, 257 Neb. 928, 601 N.W.2d 720 (1999); *State v. Hittle*, 257 Neb. 344, 598 N.W.2d 20 (1999).

■ In a bench trial of a law action, a trial court's factual findings have the effect of a jury verdict and will not be set aside on appeal unless they are clearly wrong. *Tipp-It, Inc. v. Conboy*, 257 Neb. 219, 596 N.W.2d 304 (1999).

## ANALYSIS

Farm Credit contends that once the cattle were delivered to Oconto, all Maryott had was the reservation of a security interest, which he failed to perfect. As a result, Farm Credit contends that it has a superior right to the cattle because of its perfected security interests in the property of Oconto. However, Maryott argues that through either custom and usage in the trade, the course of dealing between himself and Oconto, or an oral contract, an express agreement existed that acted to reserve title in the cattle in Maryott until he was paid. He asserts that this interest defeats any interest that Farm Credit has in the cattle.

Before the adoption of the U.C.C., cash sales in some jurisdictions were governed by the "cash sales doctrine" under which a cash buyer did not receive title to goods purchased until the seller was paid in full. Under this doctrine, a cash buyer who had not paid the seller in full could not pass title to a bona fide purchaser and an unpaid cash seller could reclaim the goods. However, it was determined that the cash sales doctrine restricted the free flow of goods in commerce and was abolished by adoption of the provisions of the U.C.C. See *Iola State Bank v. Bolan*, 235 Kan. 175, 679 P.2d 720 (1984).

### EFFECT OF RESERVATION OF TITLE

■ The U.C.C. specifically limits a seller's ability to reserve title once he or she has surrendered possession to a buyer and dictates that even when title is reserved, the effect of such a reservation is the retention of a security interest. Neb. U.C.C. § 2-401 (Reissue 1992) provides:

Each provision of this article with regard to the rights, obligations and remedies of the seller, the buyer, purchasers or other third parties applies irrespective of title to the goods except where the provision refers to such title. . . .

(1) . . . *Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest. . .*

(2) Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods, despite any reservation of a security interest . . . .

(Emphasis supplied.) This section does not provide for a revesting of title for nonpayment of the purchase price alone, unless the contract of sale so provides. *Jordan v. Butler*, 182 Neb. 626, 156 N.W.2d 778 (1968). See, also, *North Platte State Bank v. Production Credit Assn.*, 189 Neb. 44, 200 N.W.2d 1 (1972) (title passed to buyer of cattle when buyer received physical possession of them); *Paus Motor Sales v. Western Surety Co.*, 6 Neb. App. 233, 572 N.W.2d 403 (1997) (retention of title by seller is limited in effect to reservation of security interest); *Swets Motor Sales, Inc. v. Pruisner*, 236 N.W.2d 299 (Iowa 1975), citing *Jordan v. Butler, supra*. The theory behind § 2-401 is that " '[a]rticle [Two] deals with the issues between seller and buyer in terms of step-by-step performance or non-performance under the contract for sale and not in terms of whether or not "title" to the goods has passed.' " *Matter of Samuels & Co., Inc.*, 526 F.2d 1238, 1246 (5th Cir. 1976). Accord § 2-401 comment.

" 'Thus the draftsmen of the code intended that its provisions should not be circumvented by manipulation of the locus of title. For this reason . . . conditional sales, and other arrangements or devices whereby title is retained in the seller for a period following possession by the debtor are all treated under Art. 9 as though title had been transferred to the debtor and the creditor-seller had retained only a security interest in the goods.' "

*First Nat'l. Bk. of Elkhart v. Smoker*, 153 Ind. App. 71, 80, 286 N.E.2d 203, 208-09 (1972). See, also, *Cooperative Finance Ass'n v. B & J Cattle*, 937 P.2d 915 (Colo. App. 1997) (reservation of title is in nature of lien, perfection and priority of which is subject to provisions of article 9); *Herington Livestock Auction Company v. Verschoor*, 179 N.W.2d 491 (Iowa 1970) (seller only retained security interest when there was explicit agreement reserving title in seller).

In this case, even if Maryott could be determined to have explicitly reserved title in the cattle by a course of business or custom as the trial court found, under § 2-401, his interest was

nonetheless limited to the reservation of a security interest subject to the provisions of article 9. A reservation of title does not automatically give Maryott rights to the cattle. Accordingly, the next question is whether Farm Credit's perfected security interest attached under Neb. U.C.C. § 9-203 (Supp. 1995) to the cattle at issue and if that interest has priority over Maryott's unperfected security interest.

### ATTACHMENT OF FARM CREDIT'S SECURITY INTEREST

■ Under the U.C.C., attachment of an article 9 security interest takes place when (1) there is agreement that the interest attaches to the collateral, (2) the secured party has given the value of the collateral, and (3) the debtor has rights in the collateral sufficient to permit attachment. § 9-203; *Matter of Samuels & Co., Inc., supra; Cooperative Finance Ass'n v. B & J Cattle, supra.*

■ In this case, there is no dispute that Farm Credit and Oconto had a specific agreement that allowed a lien on all of Oconto's after-acquired cattle and inventory. See, also, *Matter of Samuels & Co., Inc., supra* (after-acquired property clause met agreement prong of test under similar facts). Oconto's preexisting indebtedness to Farm Credit also constituted value under the second prong of the test. Value is defined to include "security for or in total or partial satisfaction of a preexisting claim." Neb. U.C.C. § 1-201(44)(b) (Reissue 1992). This definition of value includes an article 9 security interest. *Matter of Samuels & Co., Inc., supra; Kennett-Murray & Co. v. Pawnee Nat. Bank,* 598 P.2d 274 (Okla. App. 1979); *Swets Motor Sales, Inc. v. Pruisner,* 236 N.W.2d 299 (Iowa 1975). The remaining question regarding attachment is whether Oconto had sufficient rights in the collateral to permit attachment.

■ The U.C.C. allows a buyer who has not paid for goods to transfer greater title to a good faith purchaser than he or she can claim. Further, a secured creditor of a buyer can be considered to be a good faith purchaser. Neb. U.C.C § 2-403 (Reissue 1992) provides in part:

> (1) A purchaser of goods acquires all title which his or her transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the

extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has such power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) the delivery was in exchange for a check which is later dishonored[.]

Thus in a situation where a cash seller delivers goods to a buyer and is paid with a dishonored check, § 2-403 allows the buyer in this situation to pass greater title to a good faith purchaser than the buyer could claim. *Kunkel v. Sprague Nat. Bank,* 128 F.3d 636 (8th Cir. 1997); *Matter of Samuels & Co., Inc.,* 526 F.2d 1238 (5th Cir. 1976); *Iola State Bank v. Bolan,* 235 Kan. 175, 679 P.2d 720 (1984); *Swets Motor Sales, Inc. v. Pruisner, supra.* See, also, *B & P Lumber Co. v. First Nat. Bank,* 147 Ga. App. 762, 250 S.E.2d 505 (1978) (while possessing only voidable title, buyer could legally transfer title to good faith purchaser); *First Nat'l. Bk. of Elkhart v. Smoker,* 153 Ind. App. 71, 286 N.E.2d 203 (1972) (once debtor acquires possession, he or she has acquired such rights as to allow security interest of creditor to attach). This rule is designed to promote the greatest range of freedom possible to commercial vendors and purchasers. *Id.* Furthermore, the definition of "purchaser" found in the U.C.C. is broad and includes persons taking by mortgage, pledge, or lien. § 1-201(32) and (33); *Matter of Samuels & Co., Inc., supra.* See, also, *Kennett-Murray & Co. v. Pawnee Nat. Bank, supra* (holding that secured party can qualify as good faith purchaser for value and citing cases). The relationship between a lien creditor as a purchaser and attachment of a security interest were described by the Fifth Circuit in *Matter of Samuels & Co., Inc.,* 526 F.2d at 1243, as follows:

The existence of an Article Nine interest presupposes the debtor's having rights in the collateral sufficient to permit attachment . . . . Therefore, since a defaulting cash buyer has the power to transfer a security interest to a lien creditor, including an Article Nine secured party, the buyer's rights in the property, however marginal, must be sufficient to allow attachment of a lien.

In such cases, a secured creditor can qualify as a good faith purchaser for value and receive priority under article 9 over an unpaid seller. *Matter of Samuels & Co., Inc., supra*; *Kennett-Murray & Co. v. Pawnee Nat. Bank*, 598 P.2d 274 (Okla. App. 1979). See, also, *Cooperative Finance Ass'n v. B & J Cattle*, 937 P.2d 915, 920 (Colo. App. 1997) ("a perfected security interest resulting from an after-acquired property clause prevails over the retained interest of an unpaid cash-seller"). We have held that between an unpaid seller and a secured party who qualifies as a good faith purchaser, the secured party has priority. *Jordan v. Butler*, 182 Neb. 626, 156 N.W.2d 778 (1968).

### LACK OF GOOD FAITH

Maryott contends that Farm Credit is not a good faith purchaser because it can be inferred that Farm Credit had knowledge that the drafts would be used to purchase cattle. The trial court found that Farm Credit had notice that Oconto had acquired cattle from Maryott without payment.

Farm Credit did not notify Maryott or others of its actions before canceling Oconto's lines of credit and prevented payment for the cattle by dishonoring the drafts. However, the evidence at trial was clear that Farm Credit also did not have knowledge of the specific business transactions between Oconto and Maryott and was unaware that Maryott had not been paid for the cattle he had delivered to Oconto. The burden is on Maryott to show any bad faith on the part of Farm Credit. See *Meyer v. Norwest Bank Iowa, Nat. Ass'n*, 112 F.3d 946 (8th Cir. 1997). The record does not support any finding by the district court that Farm Credit had notice that Maryott had not been paid for deliveries of cattle at the time Oconto's lines of credit were canceled. Any such finding of fact is clearly erroneous.

Further, even if evidence established that Farm Credit had a general knowledge of Oconto's nonpayment and of Maryott's claim, Farm Credit's status as an article 2 good faith purchaser would be unaffected. The good faith provisions in the U.C.C. require "honesty in fact," § 1-201(19), which is further defined as "reasonable commercial standards of fair dealing in the trade," Neb. U.C.C. § 2-103(1)(b) (Reissue 1992).

> Lack of knowledge of outstanding claims is necessary to the common law [bona fide purchaser] and is similarly

expressly required in many Code [bona fide purchaser] and priority provisions. . . . But the Code's definition of an Article Two good faith purchaser does not expressly or impliedly include lack of knowledge of third-party claims as an element.

*Matter of Samuels & Co., Inc.*, 526 F.2d 1238, 1243-44 (5th Cir. 1976). See, also, *Cooperative Finance Ass'n v. B & J Cattle, supra* (secured party prevails over unpaid seller even when secured party terminates advances on line of credit without notice and then dishonors drafts drawn in reliance on line of credit). In the context of the setoff of account funds, it has been held that actual knowledge that funds belong to a third party can limit the ability of a bank to set off funds in good faith. *Meyer v. Norwest Bank Iowa, Nat. Ass'n, supra.* However, general knowledge that an account was used for a feedlot's business transactions is not enough to charge a bank with bad faith on the basis that such a holding would act to make a bank liable every time it performed a setoff. *Id.*

In this case, lack of notice is not required under the U.C.C. in order for a purchaser to act in good faith. Further, Maryott did not specifically allege bad faith in either his petition or answer to Farm Credit's petition in intervention. In addition, there was no evidence at trial of specific notice on the part of Farm Credit. At most, any evidence of notice consisted of a general knowledge that advances of credit through the use of sight drafts were used by Oconto for its business transactions. As in the case of a setoff, a creditor would be subject to liability every time it refused to advance credit if general knowledge was sufficient to constitute bad faith. As another court has stated, "The Code's good faith provision requires 'honesty in fact' . . . it hardly requires a secured party to continue financing a doomed business enterprise." *Matter of Samuels & Co., Inc.*, 526 F.2d at 1243. Under these circumstances, Maryott did not prove bad faith on the part of Farm Credit.

## CONCLUSION

In this case, Farm Credit's perfected security interest prevails over Maryott's unperfected interest. Article 9 does not provide an exception for an unpaid cash seller. Rather, it specif-

ically provides a means for such a seller to perfect and achieve priority over previously perfected interests. Maryott could have protected his interest against Farm Credit's prior perfected interest by complying with the U.C.C.'s purchase-money provisions. See, §§ 9-107 and 9-312; *Matter of Samuels & Co., Inc., supra*; *Melcher v. Bank of Madison*, 3 Neb. App. 665, 529 N.W.2d 814 (1995), *reversed on other grounds* 248 Neb. 793, 539 N.W.2d 837; *Cooperative Finance Ass'n v. B & J Cattle*, 937 P.2d 915 (Colo. App. 1997); *Kennett-Murray & Co. v. Pawnee Nat. Bank*, 598 P.2d 274 (Okla. App. 1979); *First Nat'l. Bk. of Elkhart v. Smoker*, 153 Ind. App. 71, 286 N.E.2d 203 (1972).

> "The Code [article 9] favors purchase-money financing, and encourages it by granting to a seller of goods the power to defeat prior liens. The seller at most need only (1) file a financing statement and (2) notify the prior secured party of its interest before delivery of the new inventory. The procedure is not unduly complex or cumbersome. But whether cumbersome or not, a lender who chooses to ignore its provisions takes a calculated risk that a loss will result."

*Matter of Samuels & Co., Inc.*, 526 F.2d 328 app. at 1248 (5th Cir. 1976), quoting 510 F.2d 139 (5th Cir. 1975) (Godbold, J., dissenting). See, also, *Barwell v. First of America Bank-LaPorte*, 768 F. Supp. 1312 (N.D. Ind. 1991), quoting *Matter of Samuels & Co., Inc., supra*. Because Maryott failed to perfect his interest, Farm Credit has priority. Accordingly, the order of the trial court is reversed.

REVERSED.