In the Matter of DAMROW CATTLE CO., INC., Debtor.

Skane, Inc., Plaintiff,

v.

First National Bank of Omaha and United Nebraska Bank, Defendants.

Bankruptcy No. BK01–80266.
Adversary No. A01–8056.

United States Bankruptcy Court.
D. Nebraska.

Oct. 7, 2003.

Michael R. Snyder, Snyder & Hilliard, PC, Kearney NE, for plaintiff.

John Guthery, Perry, Guthery, Haase & Gessford, P.C., Lincoln, NE, John O'Brien, Dennis J. Bartlett, Kerr, Brosseau, Bartlett, O'Brien, LLC, Denver, CO, for Defendants.

MEMORANDUM

TIMOTHY J. MAHONEY, Chief Judge.

Trial was held in Omaha, Nebraska, on March 24 and 25, 2003, before a United States Bankruptcy Judge for the District of Nebraska on the Complaint (Fil.# 1) filed by Skane, Inc. Michael Snyder appeared on behalf of Skane, Inc., John Guthery appeared on behalf of United Nebraska Bank, and John O'Brien and Dennis Bartlett appeared on behalf of First National Bank of Omaha. This memorandum contains findings of fact and conclusions of law required by Federal Rule of Bankruptcy Procedure 7052 and Federal Rule of Civil Procedure 52. This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (H), and (O).

### *BACKGROUND*

This adversary proceeding was brought by Skane, Inc., a corporate entity that purchased certain cattle from Damrow Cattle Company (the debtor) and delivered wet corn to the debtor. Skane claims to be the owner of the cattle in question and several tons of corn delivered to the Damrow feedlot. The shareholders of Skane, the Ericksons, sold the corn to Skane and delivered the corn on behalf of Skane to the Damrow feedlot.

The Ericksons' lender is United Nebraska Bank, which claims a lien on the corn in question.

The debtor's lender was First National Bank of Omaha ("FNBO"). FNBO claims a security interest in all of the cattle in possession of the debtor, which includes the cattle claimed to be owned by Skane, and all of the corn located on the livestock feeding facility, including the corn claimed to be owned by Skane and financed by United Nebraska Bank.

The lawsuit was brought to determine the rights among the parties regarding the priority of liens and ownership interests.

### FINDINGS OF FACT

#### A. Cattle

1. FNBO holds a validly perfected security interest in all of Damrow's cattle and calves in Phelps County, Nebraska. FNBO also has filed an effective financing statement concerning such cattle and calves.

2. Pursuant to the terms of the security agreements concerning the cattle, FNBO has a security interest in farm products. The security interest extends to all farm products including, but not limited to, all livestock and their young, along with their products, produce and replacements; all crops, annual or perennial, and all products of the crops; and all feed, seed, fertilizer, medicines, and other supplies used or consumed in any farming operation.

3. Damrow Cattle Company executed promissory notes supported by the security interests. Those notes are in default and have never been paid down to a zero balance, and currently have an unpaid balance of more than $6,000,000.

4. At least from 1993 through January 18, 2001 (the date on which the Phelps County District Court appointed a receiver), Damrow Cattle was in the business of fattening and raising cattle at its feedlot located north of Holdrege, Nebraska.

5. Damrow Cattle purchased cattle and fed the cattle twice a day, seven days a week, for 150 to 175 days or more while the cattle stayed at the feedlot. Each animal typically gained approximately five hundred pounds while in Damrow Cattle's possession. They arrived at the feedlot weighing 600–700 pounds per head and, after being fed for 150–175 days, they would leave the feedlot weighing 1100–1225 pounds per head. Damrow Cattle selected the feed rations, mixed the feed rations, delivered the feed rations to the bunks, provided animal health products to the cattle, and provided general care and veterinary care for the cattle until the cattle reached finished weight.

6. Damrow Cattle did not have a Packers & Stockyards bond, and was not a licensed cattle dealer. Damrow Cattle was not a cattle trader or a cattle dealer.

7. Damrow Cattle purchased all of its cattle from various sources, and intended to keep possession of all those cattle until they had achieved finished weight. Damrow Cattle's preferred practice was to sell the cattle to customers who would keep the cattle at Damrow Cattle's feedlot for raising and fattening purposes so Damrow Cattle could avoid the market risk of owning the cattle.

8. Damrow Cattle typically was able to sell approximately 70% of its cattle to its customers and retained ownership of the remaining 30% through finished weight. The 70% which Damrow Cattle sold before reaching finished weight remained with Damrow Cattle through finished weight.

9. The cattle in Lot 1264 are the subject matter of this dispute. That lot originally contained 210 heifers. On January 18, 2001, the date the receiver was appointed, Lot 1264 contained 206 heifers because four had died. Of those animals in Lot 1264 on the date the receiver was appointed, 24 were purchased on October 13, 2000, from Medicine Lodge Livestock, Inc. On October 18, 2000, Damrow Cattle purchased from Pratt Livestock 144 heifers. On October 26, 2000, Damrow Cattle purchased from Norton Livestock 42 heifers. Damrow Cattle immediately took delivery of the cattle at its feedlot, and owned the cattle in Lot 1264 before it sold

any of the cattle in Lot 1264 to any of its customers.

10. Damrow Cattle paid for its purchase of Lot 1264 with working capital supplied by FNBO.

11. On November 1, 2000, a customer named Granstra purchased 100% of Lot 1264. Granstra paid Damrow Cattle by check which was deposited into the Damrow Cattle account at FNBO. That check was a single-payee check made payable to Damrow Cattle, Inc., and the check did not include the name of Damrow Cattle's lender, FNBO. A dispute concerning the relative rights of FNBO versus Granstra has been resolved by the opinion of the District Court of Phelps County in the state receivership case in favor of FNBO, finding that FNBO's security interest is superior to any claim or interest of Granstra or its lender because Granstra failed to purchase the cattle by joint-payee check to discharge FNBO's lien.

12. Damrow Cattle repurchased the animals from Granstra on December 25, 2000.

13. Although Damrow Cattle had sold Lot 1264 to Granstra on November 1, 2000, Damrow Cattle also sold 50% of the animals in Lot 1264 to Skane on November 7, 2000. Skane gave Damrow Cattle a cashier's check drawn on United Nebraska Bank in the amount of $61,233.86 to pay Damrow Cattle the purchase price for a 50% interest in Lot 1264. Skane's check was a single-party check made payable to Damrow Cattle, and did not include FNBO as a payee. Sometime after Damrow Cattle sold the 50% interest in Lot 1264 to Skane, Damrow Cattle sold another 50% of Lot 1264 to a Mr. Dahlgren. FNBO and Dahlgren have settled their dispute to Lot 1264 pursuant to a written settlement filed with and approved by the Phelps County District Court.

14. Whatever interest Skane acquired in Lot 1264 was acquired after Damrow Cattle purchased, became the owner of, and started to fatten Lot 1264 on Damrow Cattle's own account. Specifically, of the 210 head in Lot 1264, Damrow Cattle owned and fattened 24 head for 25 days, 144 head for 20 twenty days, and 42 head for 12 days before Skane purchased its interest in Lot 1264.

15. The cashier's check representing the purchase price for Skane's interest in Lot 1264 was issued directly from United Nebraska Bank to Damrow Cattle on the oral request of Mr. Erickson, president of Skane. United Nebraska Bank acknowledged that it failed to list as an additional payee the First National Bank of Omaha.

16. The receiver sold Lot 1264 when the cattle were fat. All feed bills were paid, and the receiver gave the Chapter 7 trustee the net proceeds of 50% of Lot 1264 in the amount of $73,128.72 plus any accruing interest, pending order of this court.

17. Skane had not registered with Nebraska's central filing system for security interests in farm products pursuant to Neb.Rev.Stat. § 52–1301 *et seq.*

18. The majority of Damrow Cattle sales were made to purchasers who paid with joint-payee checks.

19. FNBO's policy and practice concerning the release of its security interest upon a borrower's sale of farm product collateral is to endorse the back of the buyer's joint-payee check used to purchase the farm product collateral from the bank's borrower. Such a practice is apparently typical in the industry. FNBO has a special procedure with regard to endorsing joint-payee checks to assure that there is some evidence that the lien held by FNBO is released. The check is dealt with by a particular officer of the bank and an en-

484

dorsement is specifically entered on the endorsement section of the check before it is sent through the processing system. This practice is in direct contrast to the treatment of single-payee checks, which go directly through the check processing system without having been viewed by or endorsed by an officer of the bank.

20. Based upon testimony at trial of both Dennis Damrow and Tom Jensen, it is clear that it was impossible to trace Skane's check to any loan repayment or to any other disbursement from Damrow Cattle's general deposit account.

21. Although strenuously argued on behalf of Skane, Skane's single-payee check cannot be traced to repayment of Damrow Cattle's notes and FNBO is not acting inequitably by trying to be paid "twice."

### B.  Corn

1. Erickson raised and initially owned the corn at issue here.  Erickson assigned his claim to Skane.

2. Erickson delivered the corn from his fields directly to Damrow Cattle's feedlot between September 9 and September 15, 2000.  That corn was high-moisture corn which needed to be compacted and covered to preserve its feed qualities.  Damrow Cattle commingled and compacted Erickson's high-moisture corn with the high-moisture corn which numerous other local corn producers delivered to Damrow Cattle.

3. On December 1, 2000, Damrow Cattle paid Erickson for 50,000 bushels Erickson delivered to the corn pile, and Skane does not dispute Damrow Cattle's ownership of those 50,000 bushels.

4. Unlike dry corn, there is no significant resale market for high-moisture corn because once it gets "put up" and compacted, it must be fed fairly quickly after it is removed from the pile or it will lose its feed qualities.

5. Damrow Cattle has never sold, used, or fed any high-moisture corn anywhere other than at Damrow Cattle's feedlot.

6. With respect to all prior years' deliveries of Erickson's corn to Damrow Cattle, all of those deliveries were fed by Damrow Cattle to cattle located at the Damrow Cattle feedlot.

7. Each truckload of Erickson's corn delivered to Damrow Cattle's feedlot was weighed, and a scale ticket was given by Damrow Cattle to Erickson for each truckload.

8. The scale ticket summaries describe the commodity delivered (No. 2 corn), with date of delivery (specific dates are identified between September 9 and September 15, 2000, for each truckload), and the quantity of corn delivered in each truckload, including a statement of gross weight, moisture content, and net weight in pounds and a corresponding quantity of bushels.

9. Erickson delivered the scale ticket summaries to the United States Department of Agriculture's Farm Service Administration ("FSA") office located in Phelps County on September 15 and 20, 2000.

10. Erickson applied for, and received a United States Department of Agriculture Loan Deficiency Payment ("LDP") in the fall of 2000 for the corn which he delivered directly from his fields to Damrow Cattle. Erickson used the LDPs to pay down his loans with United Nebraska Bank.

11. Erickson and Damrow Cattle agreed that Erickson reserved the option to price and receive payment for the corn at any time after it was delivered to Damrow Cattle.  Erickson and Damrow Cattle agreed that Erickson's sale price for the corn was determined in accordance with

the daily published price of corn stated by the Holdrege Cooperative elevator on the day Erickson exercised his option to sell at that price and receive payment.

12. Erickson did not require that Skane's corn be kept separate from other producers' corn. FNBO had a financing statement of record covering Damrow Cattle's corn. Erickson did not notify the bank of the interest he claimed in the commingled corn. Erickson did not post any signs on Damrow Cattle's premises to describe his interest in the corn. Erickson did not file any U.C.C. financing statement to notify the public that he claimed corn located in Damrow Cattle's premises for consignment or bailment. Erickson did not file a financing statement or take any other steps necessary to acquire a purchase money security interest in the corn Erickson delivered to Damrow Cattle.

13. Damrow Cattle affirmatively told FNBO that it owned, and had a right to pledge, the corn which Erickson delivered to Damrow Cattle to support borrowings on Damrow Cattle's line of credit with the bank. Damrow Cattle supplied numerous borrowing base certificates to FNBO.

14. Dennis Damrow testified, and this court accepts as a fact, regarding the December 15, 2000, Borrowing Base Certificate (Fil.# 107) that the corn Erickson delivered to Damrow Cattle was included on line five describing "Grain and Feed Inventory" and that Damrow Cattle's liability to Erickson/Skane for the corn was included in line eight describing "Accounts Payable."

15. In direct contrast to the manner in which it treated the corn for purposes of its relationship with FNBO, Damrow Cattle treated Erickson/Skane as if the com-mingled corn retained its identifiability as Erickson/Skane's separate property. Damrow Cattle kept a ledger recording the amount of corn fed to each owner's animals, and on the ledger sheet for Skane, gave Skane credit for Skane corn used to feed Skane animals. The "ledger" transaction between Damrow Cattle and Skane was not communicated to FNBO.

16. Although some of the corn, in its commingled state, was fed to Skane cattle located in Lot 1264, such action does not nullify the "sale." The sale occurred as a result of the delivery of the corn and the agreement that it would be priced later. It is true that on one set of books kept by Damrow Cattle, the corn that was fed to the Skane cattle was shown as some type of a credit against the operating expense obligation Skane had to Damrow Cattle for caring for the animals, but the reality of the situation was that the corn delivered by Erickson on behalf of Skane was com-mingled and did not keep its separate identity for accounting purposes.

17. Damrow Cattle's promissory notes, security agreements, and financing statements with FNBO gave the bank a perfected lien on all corn which Damrow Cattle then owned and thereafter acquired rights in.

18. FNBO filed an effective financing statement with the Nebraska Secretary of State on April 18, 2000, evidencing a security interest in Damrow Cattle's corn, among other farm products.

### CONCLUSIONS OF LAW AND DISCUSSION

#### A. Cattle

◼ The cattle in question are "farm products" as that term is used in Neb. U.C.C. § 9–109(3).[1] As is required by that

---

**1.** Any citations to Article 9 of the Nebraska Uniform Commercial Code are references to Article 9 in effect prior to July 1, 2001.

statutory section, the cattle are livestock in the possession of a debtor engaged in raising, fattening, grazing, or other farming operations. *See Ashburn Bank v. Farr*, 206 Ga.App. 517, 426 S.E.2d 63, 65 (1992):

> [Borrower] ran a feedlot operation in which he entered into agreements with cattle owners to take possession of their cattle, feed and fatten them. He also periodically purchased cattle to raise, fatten and resell. [Borrower] was not a cattle dealer or broker who bought cattle to hold for immediate resale. In the present transaction, [Borrower] bought the cattle at issue to fatten and resell, and agreed to sell the cattle to [Rancher] after fattening. It is clear under these circumstances that [Borrower] was engaged in farming operations, and that the cattle were farm products.

*See also In re Charolais Breeding Ranches, Ltd.*, 20 U.C.C. Rep. Serv. 193, 1976 WL 23698 (Bankr.W.D.Wis.1976) (Debtor bred, raised, and maintained cattle herd in which investors purchased animals as a tax shelter. The court ruled that the cattle were farm products rather than inventory because the debtor was in the business of raising and feeding cattle.) and *Swift & Co. v. Jamestown Nat'l Bank*, 426 F.2d 1099 (8th Cir.1970) (Cattle in the possession of a borrower who was fattening them for sale, either on his own behalf or on behalf of Swift, were farm products).

■ Under the Uniform Commercial Code, a security interest attaches when three conditions have been met:: (1) the debtor has signed a security agreement which contains a description of the collateral in question, including after-acquired collateral; (2) value has been given; and (3) the debtor has rights in the collateral. U.C.C. § 9–203(1). Damrow Cattle executed and delivered security agreements covering Damrow Cattle's currently owned and after-acquired property and FNBO

funded the loans supported by the security agreements. Damrow Cattle then acquired rights in Lot 1264 by purchasing the lot in three groups. Therefore, the security interest of FNBO attached to the animals in Lot 1264.

■ FNBO perfected its security interest in the animals in Lot 1264, which have been determined above to be "farm products" under Nebraska's U.C.C. Article 9. FNBO filed a financing statement with the Nebraska Secretary of State as required by Nebraska law. U.C.C. § 9–401(1)(b). In addition to the U.C.C. financing statement, FNBO on April 18, 2000, filed its effective financing statement with the Nebraska Secretary of State. That document covered all Damrow Cattle's cattle and calves located in Phelps County.

■ Although the cattle in Lot 1264 had been sold to Granstra prior to the sale to Skane, Skane, by agreeing to purchase 50% of Lot 1264 and delivering to Damrow Cattle a check for the 50% interest, did obtain some interest in Lot 1264. Such interest was inferior to that of Granstra at the time of the original purchase, and inferior to the interest of FNBO by virtue of its perfected security interest and its effective financing statement filing with the Nebraska Secretary of State.

Skane did not register as a buyer with the Secretary of State under Neb.Rev. Stat. § 52–1301 *et seq.* According to that statutory scheme, to be afforded any protection to buy a farm product free and clear of a lien, the buyer must register, and if he does not, he is barred from asserting a claim against a secured creditor of the farm product who had not agreed to release its lien. *See* Judge Kopf's opinion in *AG Services of America, Inc. v. United Grain, Inc.*, 75 F.Supp.2d 1037, 1047 (D.Neb.1999). Because the check used by Skane to purchase the cattle

was a one-party check, which was not made payable to FNBO, the lien held by FNBO was not discharged. The evidence summarized above shows that FNBO has a particular procedure that it follows to assure a buyer of farm products from FNBO's customer that the lien of FNBO is released. If a two-party check is presented to the bank, it causes an individually executed endorsement to be placed upon the check. Both the bank and the purchaser are then assured that the bank has received payment for the particular farm products which are the subject of the check. Other procedures could be used, such as a purchaser refusing to deliver a check without receiving any specific lien release from FNBO.

In this case, there is no evidence that FNBO has released its lien. There is not a two-party check in evidence. There is not any specific written lien release in evidence. There is no testimony that the purchaser, Skane, the seller, Damrow Cattle, or the purchaser's lender, United Nebraska Bank, had any discussion about a release of the FNBO lien on the cattle.

Finally, FNBO has not waived its security interest, either by implication or estoppel. The Nebraska version of U.C.C. § 9–306(2) provides:

> (2) Except where this article otherwise provides, a security interest continues in collateral notwithstanding sale, exchange, or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor. Authorization to sell, exchange, or otherwise dispose of farm products shall not be implied or otherwise result, nor shall a security interest in farm products be considered to be waived, modified, released, or terminated, from any course

of conduct, course of performance, or course of dealing between the parties or by any trade usage in any case in which: (a) The secured party has filed an effective financing statement in accordance with the provisions of sections 52–1301 to 52–1321, Reissue Revised Statutes of Nebraska . . . .

Judge Kopf's opinion in *AG Services* deals with the assertion of an implied waiver in great detail. 75 F.Supp.2d at 1048–50.

Skane has argued that the bank has been paid and that it is inequitable to permit the bank to be paid a second time for Skane's interest in Lot 1264. Skane's assertion is that the check delivered for payment of 50% of Lot 1264 can be traced and that the proceeds of the check were actually used by the bank to pay down on the note. The evidence, however, is that Skane's check could not be traced to any withdrawal or disbursement from the bank account, or to any payment on the notes.

The Nebraska Supreme Court in *Miracle Hills Centre Ltd. Partnership v. Nebraska Nat'l Bank of Omaha*, 230 Neb. 899, 434 N.W.2d 304 (1989), discusses the difference between special deposit accounts and general deposit accounts, such as the Damrow Cattle account at FNBO, and the court held that a claimant cannot assert a claim to funds deposited in a commingled general deposit account unless the claimant is able "to provide clear and satisfactory evidence that the deposit in question was not a general deposit." 230 Neb. at 902, 434 N.W.2d at 306. The court further found that it was not inequitable for the bank to deal with the account as if it was a general deposit account and further stated that "[t]he simple expedient of issuing joint checks payable to FSI and the subcontractors or providing limitations or conditions on the deposit or account could have avoided the situation which

Miracle Hills now finds itself." 230 Neb. at 903, 434 N.W.2d at 307.

In this case, Skane did nothing to protect itself from the application of the Nebraska effective financing statement requirements, nor did it do anything to protect itself from the perfected security interest held by FNBO in all of the Damrow Cattle livestock assets. Skane's reliance at this time upon equitable principles is not appropriate.

## B. Corn

Damrow Cattle's loan documents, including security agreements, granted FNBO a perfected lien on all corn owned at the time of execution of documents and all after-acquired corn in which Damrow Cattle had rights. The corn was delivered directly from Erickson to Damrow Cattle on behalf of Skane. The corn was intended by both parties to be, and actually was, commingled with other corn owned by Damrow Cattle. Erickson obtained scale ticket summaries and used those scale ticket summaries to obtain USDA loan deficiency payments from the Farm Service Agency.

Erickson's agreement with the Farm Service Agency required Erickson to give up any beneficial interest in the corn he delivered to Damrow Cattle. Under the corn storage agreement (Fil.# 103), Erickson agreed that his deliveries of corn to the feedlot would be treated as "field direct" transactions for loan deficiency payments. The United States Department of Agriculture regulations concerning loan deficiency payments are set forth in 7 C.F.R. 1421. That section requires a producer to give up beneficial interest in the commodity in order to obtain a "field direct" loan deficiency payment.

By execution of the CCC Form–709, one of the contractual documents, Erickson not only gave possession and control of the corn to Damrow Cattle, but gave to Damrow Cattle all beneficial interests in the corn upon the application for and receipt of loan deficiency payments. Damrow Cattle thereafter held a beneficial interest and a right to pledge the corn to FNBO pursuant to U.C.C. § 9–203.

All of the corn was delivered pursuant to an oral agreement. Erickson received scale ticket summaries listing the type of commodity, the quantity, the date of delivery, the shipper and the receiver of the goods. Damrow Cattle took possession of the corn and commingled it into a compacted corn pile with other corn located on the feedlot. The parties agreed that there was a deferred payment plan with a variable price arrangement.

Damrow Cattle showed the corn purchase as inventory in its dealings with FNBO and treated its obligation to Erickson as a general trade debt.

In Nebraska, a contract for sale includes both a "present sale of goods and a contract to sell goods at a future time." U.C.C. § 2–106(1), *Southwest Bank of Omaha v. Moritz*, 203 Neb. 45, 277 N.W.2d 430, 436 (1979).

Although Mr. Erickson claims that he did not pass title to Damrow Cattle simply because of the delivery of the corn, he certainly did sell the corn for a "price later" disposition, and he did deliver possession to Damrow Cattle. Damrow Cattle was permitted to commingle the corn and use it in its ordinary business. Under the Nebraska U.C.C. and case law, title passed to Damrow Cattle at the time the goods were identified and delivered to Damrow Cattle. U.C.C. § 2–401(1) & (2). *Huskinson v. Vanderheiden*, 197 Neb. 739, 743, 251 N.W.2d 144, 147 (1977). Any reservation of rights by Skane/Erickson to the corn is only reservation of a security interest, and that reserved security inter-

est was not perfected or sufficient to defeat FNBO's perfected lien on Damrow Cattle's after-acquired corn. *See Maryott v. Oconto Cattle Co.,* 259 Neb. 41, 607 N.W.2d 820 (2000).

Under Nebraska law, even if title did not pass, Damrow Cattle did have sufficient "rights" in the corn to permit the security interest of FNBO to attach. *See Maryott v. Oconto Cattle Co.,* 259 Neb. at 50–51, 607 N.W.2d at 827. In this case, Damrow Cattle had possession of the corn and represented to FNBO that the corn was its own. Erickson/Skane gave up all beneficial interest in the corn. Damrow Cattle had sufficient "rights" in the corn to pledge it to FNBO and for the FNBO security interest to attach.

Any interest of the United Nebraska Bank in the corn is dependent upon the interest of Skane. However, United Nebraska Bank did not file an effective financing statement covering the corn, and United Nebraska Bank has disclaimed any interest in the corn. Damrow Cattle acquired the corn free and clear of the United Nebraska Bank's lien, if any such lien is still in effect after the disclaimer.

### CONCLUSION

Separate judgment will be entered in favor of First National Bank of Omaha and against the plaintiff and United Nebraska Bank. The First National Bank of Omaha's security interest in the cattle in Lot 1264 and the proceeds of such cattle, and the corn at issue, is superior to the interest of either Skane or United Nebraska Bank.