# United States Bankruptcy Appellate Panel

## For the Eighth Circuit

_____

No. 16-6029

_____

In re: Charles Donald Leonard, doing business as Leonard Cattle Company;
Margaret Rose Leonard, doing business as Leonard Cattle Company

*Debtor*s

------------------------------

Sweetwater Cattle Company, L.L.C.; Farm Credit Services of America, PCA

*Plaintiffs - Appellees*

v.

Leigh Murphy, doing business as Murphy Cattle Company

*Defendant - Appellant*

_____

Appeal from United States Bankruptcy Court
for the District of Nebraska - Omaha

_____

Submitted: January 6, 2017
Filed: February 24, 2017

_____

Before FEDERMAN, Chief Judge,[1] KRESSEL and SHODEEN, Bankruptcy Judges

_____

[1]     The Honorable Thomas L. Saladino, United States Bankruptcy Judge for the District of Nebraska, became Chief Judge of the Eighth Circuit Bankruptcy Appellate Panel on February 1, 2017.

FEDERMAN, Chief Judge

Leigh Murphy d/b/a Murphy Cattle Company appeals from the Bankruptcy Court's[2] Orders holding that Sweetwater Cattle Company, L.L.C.'s lien in certain cattle is superior to Murphy's rights as an unpaid seller of the cattle. For the reasons that follow, we AFFIRM.

## INTRODUCTION

This is a dispute over the validity and priority of interests in cattle. To summarize, Leigh Murphy d/b/a Murphy Cattle Company sold cattle to Debtor Charles Leonard, who delivered them to Sweetwater Cattle Company for care and feeding. Sweetwater also financed Leonard's purchase of the cattle through a line of credit it has with Farm Credit Services of America, and asserted a lien against the cattle. However, although Sweetwater had advanced the funds to Leonard for the purchase of the cattle, Murphy only received partial payment for it. As a result, Murphy exercised his right to "reclaim" the cattle under the Uniform Commercial Code for nonpayment. The problem for Murphy is that the holder of a valid security interest takes priority over such a reclaiming unsecured creditor. Sweetwater claims that its security interest attached to the cattle the moment Leonard became the owner of them, even if Leonard's title was voidable due to Murphy's later assertion of reclamation rights. Murphy asserts (1) that Sweetwater's lien is not valid because title to the cattle did not properly transfer from Murphy to Leonard and, (2) even if it did, Sweetwater did not exercise good faith as required for a valid lien under the Uniform Commercial Code. Leonard

---

[2] The Honorable Thomas L. Saladino, United States Bankruptcy Judge for the District of Nebraska.

filed a Chapter 11 bankruptcy case and the cattle were sold, with the proceeds being held pending the outcome of this litigation. The Bankruptcy Court concluded on cross motions for summary judgment that Sweetwater's lien and, in turn, Farm Credit's lien, were valid and that they were entitled to the proceeds of the cattle. Murphy appeals.

## SUMMARY JUDGMENT STANDARD

The BAP reviews *de novo* the bankruptcy court's grant of summary judgment.[3] Summary judgment is appropriate "only when all the evidence presented demonstrates that 'there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.'"[4]

## STATEMENT OF FACTS

Although the parties do dispute certain statements of fact made by the Bankruptcy Court, the following facts are uncontroverted:

1. Sweetwater Cattle Company, L.L.C., is a Nebraska limited liability company with its headquarters in Buffalo County, Nebraska.

2. Charles Leonard, one of the debtors in this case, is an individual residing in Sarpy County, Nebraska, doing business as Leonard Cattle Company.

3. Leigh Murphy is an individual doing business as Murphy Cattle Company in Colorado and New Mexico.

---

[3]
 *Burk v. Beene*, 948 F.2d 489, 492 (8th Cir.1991); *Jafarpour v. Shahrokhi* (*In re Shahrokhi*), 266 B.R. 702, 706 (B.A.P. 8th Cir. 2001).

[4]
 *In re Shahrokhi*, 266 B.R. at 706 (citations omitted).

4. For more than 20 years, Leonard has been in the business of buying and selling cattle as a bonded commission dealer as well as for his own account.

5. Leonard has had prior dealings with Sweetwater, and at the time the bankruptcy case was filed, other cattle owned by Leonard were in the Sweetwater lot.

6. Leonard and Murphy executed a written contract on July 10, 2015, for Leonard to purchase up to 400 head of cattle from Murphy, with delivery to be taken by loading trucks in Fraser, Colorado, between September 20, 2015, and October 5, 2015.

7. Leonard paid Murphy a $10,000 down payment when the contract was entered into. The balance of $802,910 was to be paid at delivery.

8. Leonard purchased the cattle from Murphy with five checks, four of which were later dishonored. One check, in the amount of $41,208.96, cleared the bank.

9. Leonard's dealings with Sweetwater were through Mike Twitchell, who is the managing member of Sweetwater.

10. Sweetwater's business model involved providing secured financing to its customers who needed it. Sweetwater made these loans from a line of credit it has with Farm Credit Services.

11. Leonard had a $2.5 million line of credit with Sweetwater which was secured by, *inter alia*, after-acquired cattle.

12. In broad terms, the arrangement between Leonard and Sweetwater was that Leonard would transfer possession of the cattle to Sweetwater, Sweetwater would finance Leonard's purchase and the feed and care of the cattle, with a deduction in the nature of a down payment. Thereafter, Sweetwater would continue to feed and care for the cattle, and ultimately market and sell those cattle. At the time of sale, the proceeds would be used first to repay Sweetwater for the amount financed, including feed and care, with the balance going to Leonard.

4

13. At the time of this transaction, Leonard had a line of credit with Sweetwater which allowed him to request funds to purchase cattle subject to Sweetwater's blanket security interest in all of Leonard's cattle. The deal between Leonard and Sweetwater on the cattle at issue here was made on or about September 23, 2015, at which time the cattle were transferred from Murphy's facility in Colorado to Sweetwater's lot north of Kearney, Nebraska.

14. Sweetwater loaned Leonard $598,402.16 to finance the purchase of this cattle.

15. The cattle had been in the Sweetwater lot for a little less than a month when Twitchell was contacted by Murphy, who inquired whether the cattle were located at the Sweetwater lot. Twitchell confirmed they were, and he became aware at that point that there was a dispute between Leonard and Murphy arising from the dishonor of Leonard's checks to Murphy.

16. Prior to that call from Murphy, no representative of Sweetwater had any knowledge of the Murphy-Leonard transaction, other than the fact that the cattle arrived at Sweetwater's lot with a bill of sale showing that Murphy had sold the cattle to Leonard.

17. Murphy filed a replevin action in Buffalo County District Court seeking to recover the cattle, and an order in replevin was entered by that court finding Murphy was entitled to reclaim the cattle for which he had not received payment.

18. The cattle were eventually sold and the gross proceeds totaled $883,073.25. Of that amount, Sweetwater has been paid $215,119.87 for feeding and caring for the animals. The balance is held in escrow pending the outcome of this litigation.

In addition, and of particular relevance to this appeal, it is uncontroverted (or uncontrovertable) that, on September 23, 2015, pursuant to the July 10 contract, Murphy sorted and loaded 395 head of his cattle onto trucks in Fraser, Colorado, to be transported to Sweetwater's lot in Nebraska. That same day, September 23,

Murphy signed a Bill of Sale (which was part of a document which also included a Colorado State Board of Inspection Certificate) certifying that he, Murphy, had "sold and delivered" 395 mixed steer to Leonard. An inspector with the Colorado Department of Agriculture certified that he had inspected 395 mixed steer that same day, which were identified by a particular brand. The cattle, along with the Certificate / Bill of Sale document, were delivered to Sweetwater sometime on September 23 or in the early morning hours of September 24. Sweetwater had not reviewed the Certificate / Bill of Sale prior to the delivery of the cattle because that document was delivered along with the cattle.

The Bill of Sale is dated, identifies Murphy as the seller and Leonard as the buyer, and identifies the 395 mixed steer with a brand identifier and brand position. It is signed by Murphy and a witness, who was also the identified inspector on the Certificate. It is not signed by Leonard as the buyer, nor does it contain post office addresses for the seller, buyer, or witness.

What is disputed, factually, is the precise timing of the delivery of the cattle to Sweetwater *vis a vis* Sweetwater's review of the accompanying Bill of Sale *vis a vis* the movement of the money. For reasons to be given, resolution of that question is not necessary to determine (1) that ownership of the cattle passed to Leonard; and (2) Sweetwater's lien attached to the cattle when Leonard became their owner, even if that ownership was voidable due to Murphy's reclamation rights.

Because of the dishonored checks, Murphy was not paid for 371 of the steer which had been delivered to Sweetwater's lot. Leonard filed a bankruptcy case and Murphy, Sweetwater, and Farm Credit are fighting over the cattle's proceeds. Because Sweetwater and Farm Credit's interests are aligned in this appeal (and in

6

fact, filed a joint brief), for purposes of discussion, we sometimes refer to them collectively as "Sweetwater."

## DISCUSSION

Murphy properly exercised his right to reclaim the cattle after the checks were dishonored. Section 2-507 of the UCC (as applicable in both Colorado and Nebraska) allows a seller of goods to reclaim – take back the goods – when the buyer fails to pay for the goods.[5] However, the Bankruptcy Court found that, in the meantime, such cattle had been impressed with Sweetwater's security interest, and that that security interest held priority over Murphy's interest as a reclaiming seller.[6] Murphy raises eighteen points on appeal, but his argument is essentially two-fold. First, he asserts, title to the cattle never transferred from him to Leonard under applicable Colorado law and, therefore, Sweetwater's after-acquired property lien could not have attached to the cattle. Second, even if title did transfer to Leonard, Murphy contends that Sweetwater did not act in good faith as required to create a lien under the Uniform Commercial Code. Before dealing with those issues, we briefly consider a choice of law question not raised by the parties.

---

[5] Neb. Rev. Stat. U.C.C. § 2-507(2) ("Where payment is due and demanded on the delivery to the buyer of goods or documents of title, his right as against the seller to retain or dispose of them is conditional upon his making the payment due."); Colo. Rev. Stat. § 4-2-507(2) (same). *See also* Neb. Rev. Stat. § 2-511(3) ("[P]ayment by check is conditional and is defeated as between the parties by dishonor of the check on due presentment."); *Rowse v. Platte Valley Livestock, Inc.*, 604 F.Supp. 1463 (D. Neb. 1985) ("Under these rules, the [sellers] had the right to recover the cattle when they discovered that [the buyer's] check had been dishonored.").

[6] *See, e.g.*, Neb. Rev. Stat. U.C.C. § 2-702(3) ("The seller's right to reclaim under subsection (2) is subject to the rights of a buyer in ordinary course or other good faith purchaser or lien creditor under this article (section 2-403).").

7

# I.  Choice of Law

Leonard is a resident of Nebraska, and was doing business there.  The cattle were transferred by Murphy in Colorado, and then taken to Sweetwater's feed lot in Nebraska.  "A federal court sitting in diversity generally applies the substantive law of the state in which it sits, including the rules governing the choice of law."[7] "Under Nebraska law, the first step in a conflict-of-law analysis is to determine whether there is an actual conflict between the legal rules of different states."[8]  "An actual conflict exists when a legal issue is resolved differently under the law of two states."[9]  With one exception discussed below, the relevant portions of the UCC are the same in Colorado and Nebraska.  In any event, we conclude that the result here would be the same under either Colorado or Nebraska law, and so, as the parties did in their briefs, we rely on cases from both states interpreting the relevant provisions of the UCC.

# II.  Transfer of Title Under the
# Colorado Livestock Bill of Sale Statute

On the transfer of title question, the Bankruptcy Court concluded that Leonard obtained title to the cattle, and Sweetwater's lien attached to it, under Article 2 of the Uniform Commercial Code.  Murphy asserts that Colorado's

---

[7] *Platte Valley Bank v. Tetra Financial Group, LLC*, 682 F.3d 1078, 1082 (8th Cir. 2012) (citations omitted).

[8] *Id.* (citation and internal quotation marks omitted).  *See also Nordhues v. Maulsby*, 815 N.W.2d 175, 186 (Neb. App. 2012).

[9] *Nordhues v. Maulsby*, 815 N.W.2d at 186.

8

livestock bill of sale law controls the transfer of title to livestock, that the bill of sale in this case was not in strict compliance with that statute, and that the UCC is irrelevant as to whether Leonard became owner of the cattle.

Section 35-54-101 of the Colorado Revised Statutes, commonly referred to as the "livestock bill of sale law," provides:

> No person, whether as principal or agent, shall sell or otherwise dispose of any livestock, nor shall any person, whether as principal or agent, buy, purchase, or otherwise receive any such livestock, unless the person so selling or disposing of any such livestock gives, and the person buying, purchasing, or otherwise receiving any such livestock takes, a bill of sale, in writing, of the livestock so sold or disposed of, or so bought, purchased, or otherwise received.[10]

Any person who fails to comply with § 35-54-101 is guilty of a misdemeanor.[11]  In addition, § 35-54-105(1) provides:

> (1) Any person who sells or offers for sale or trades any livestock upon which such person has not his recorded mark or brand, or for which the person so offering has neither bill of sale nor power of attorney from the owner of such livestock authorizing such sale, is guilty of theft, *unless such person upon trial shall establish and prove that he was at the time the actual owner of the livestock so sold or traded*, or offered for sale or trade, or that he acted by the direction of one proven to be the actual owner of such livestock.[12]

Thus, if Murphy had sold the cattle to Leonard without complying with this statute, and had not been able to prove that he actually owned them prior to the sale, he

---

[10] Colo. Rev. Stat. § 35-54-101.

[11] Colo. Rev. Stat. § 35-54-102.

[12] Colo. Rev. Stat. § 35-54-105(1) (emphasis added).

would have violated the statute.  Of course, Murphy was the owner, so the statute is not applicable.

Section 35-54-103, in turn, describes the requirements for a livestock bill of sale:

(1) A duly executed bill of sale is an instrument in writing by which the legal owner or authorized agent transfers to the buyer the title of livestock therein described and guarantees to defend said title against all lawful claims. It shall definitely describe the animal sold as follows:

* * *

(b) Registered cattle, registration number tattooed in ear, name, sex, breed, brand, and marks, if any;

(c) Range cattle, sex, age, breed, brands or earmarks, wattle or dewlap, horned or dehorned;

(d) When the sale or transfer involves neat cattle carrying one or more Colorado recorded brands, the cattle shall be tallied for brands, and the brands described in the bill of sale, giving location on the animal of all Colorado recorded brands;

* * *

(2) *Both the seller and the buyer shall sign the bill of sale, giving the post-office address of each, in the presence of a witness*, who also signs with his name and address, and who is a legal resident of the county where the transfer of the described livestock takes place. The bill of sale shall be dated the day of the transaction.[13]

---

[13] Colo. Rev. Stat. § 35-54-103 (emphasis added).

Courts in Colorado have on more than one occasion acknowledged that these laws "were clearly designed to prevent rustling"[14] by imposing criminal penalties for selling someone else's cattle. That is not an issue in this case.

Here, as stated above, it is undisputed that Murphy tendered a Bill of Sale when the cattle were loaded in Colorado and it was delivered to Sweetwater along with the cattle. However, although the Bill of Sale is dated; identifies Murphy as the seller and Leonard as the buyer; sufficiently describes the cattle in accordance with the statute; and is signed by Murphy and a witness, it is not signed by Leonard as the buyer, and none of the parties' post office addresses are given. It is, therefore, indisputable that the Bill of Sale did not fully comply with § 35-54-103(2). That being the case, Murphy asserts that the Bankruptcy Court should have held that, since the Bill of Sale he signed did not fully comply with the statute, he did not transfer ownership of the cattle to Leonard and, therefore, Leonard could not have granted Sweetwater a security interest in it. Murphy asserts the analysis should end there, and that the Bankruptcy Court erred in turning to the UCC. We disagree.

A similar scenario was presented in *Cugnini v. Reynolds Cattle Co.*[15] In that case, Cugnini and Reynolds disputed which of them owned certain cattle. Cugnini

_____

[14] *Moffat County State Bank v. Producers Livestock Marketing Assoc.*, 598 F.Supp. 1562, 1566 (D. Colo. 1984) ("The livestock bill of sale laws were clearly designed to prevent rustling."). *See also Cugnini v. Reynolds Cattle Co.*, 648 P.2d 159, 162 (Colo. App. 1981) ("These laws plainly were designed to provide a means for detection of cattle theft, but it does not necessarily follow that they do not also regulate private sales.").

[15] 648 P.2d 159 (Colo. App. 1981) ("*Cugnini I*"), *aff'd*, 687 P.2d 962 (Colo. 1984) ("*Cugnini II*").

had transferred possession of the cattle to a Russell, without complying with the Colorado livestock bill of sale laws. Russell, who had given bad checks to Cugnini, transferred the cattle to Reynolds, who paid Russell for them. As with the transfer from Cugnini to Russell, the transfer from Russell to Reynolds again did not comply with the bill of sale laws. The trial court had held that title to cattle only passes if the transfer of possession is accompanied by a bill of sale in compliance with the statutes and, because Reynolds failed to comply, he was liable to Cugnini for conversion.

In *Cugnini I*, the Colorado Court of Appeals expressly agreed with the trial court's conclusion "that compliance with the livestock bill of sale laws is required to pass title and that Reynolds did not comply."[16] However, in an attempt to harmonize the livestock bill of sale laws with the UCC, the Court of Appeals reversed the trial court's decision, holding that, "[w]here neither party can claim valid title under the livestock bill of sale laws, we must resort to the law merchant, as now embodied in the UCC, to resolve the dispute."[17] The Court of Appeals held that, under the UCC's merchant laws (which we discuss below), title to the cattle passed to Reynolds at the time and place at which Russell completed physical delivery of the cattle because the Cugninis entrusted possession of the cattle to Russell, giving him the power to transfer all their rights to Reynolds.[18] Since Reynolds acquired title under the UCC, he was entitled to the proceeds.[19] In

---

[16] *Cugnini I*, 648 P.2d at 162.

[17] *Id.* at 164.

[18] *Id.*

[19] *Id.*

12

*Cugnini II*, the Colorado Supreme Court affirmed, also holding that Reynolds was entitled to the proceeds.

Murphy attempts to distinguish *Cugnini* by arguing that there, the seller had itself not received a valid bill of sale prior to transferring the cattle to its buyer. Thus, neither party could establish ownership under the bill of sale laws. Here, Murphy contends he raised the cattle from birth, and so he, as the seller, had not received a defective bill of sale like Cugnini had. Indeed, as Murphy suggests, the Court of Appeals' decision in *Cugnini I* can be read to have turned at least in part on the fact that neither the seller, nor the buyer, had acquired title in compliance with the bill of sale laws.

However, when the Colorado Supreme Court affirmed in *Cugnini II*, the decision did not turn on the fact that the seller had also not obtained title under a bill of sale. In fact, in *Cugnini II*, the Supreme Court was careful to say that it was "affirm[ing] *the result reached* by the court of appeals."[20] Rather, after agreeing with the Court of Appeals that neither party had complied with the statute, it said, in blanket fashion, that "noncompliance with the livestock bill of sale requirements does not necessarily prevent transfer of title."[21] The Supreme Court then turned to § 35-54-105(1) of the livestock bill of sale statutes, which had not been mentioned by the Court of Appeals in *Cugnini I*. That section, as quoted above, provides that a person who sells livestock which is not marked by that person's brand, and who does not have a bill of sale or power of attorney, is guilty of theft, "*unless* such

---

[20] *Cugnini II*, 687 P.2d at 963 (emphasis added).

[21] *Id.* at 965.

person upon trial shall establish and prove that he was at the time *the actual owner* of the livestock so sold or traded."[22]  "Thus," the Supreme Court held, "the livestock bill of sale statutes contemplate that being an 'actual owner,' i.e., holding valid title, is not necessarily dependent upon possessing a bill of sale that complies with the statutory requirements."[23]  "Since the livestock bill of sale statutes do not necessarily determine when valid title to cattle passes," the Court held, "we must look to other sources of law [such as the UCC] to resolve the present dispute."[24]

> Statutes that address the same subject matter should be construed harmoniously if such a construction is possible. Although the livestock bill of sale laws control other questions that may arise out of the sale of cattle, the principle of harmonious construction of statutes leads us to the conclusion that, under the circumstances of this case, the passage of title is controlled by the pertinent provisions of the UCC rather than by the livestock bill of sale statutes.  Our holding on this issue is consonant with the current position taken by the majority of jurisdictions that have construed similar statutes.[25]

The Court then held that since *Cugnini himself* had title to the cattle prior to the Cugnini/Russell transaction, then UCC § 2-403 applied.  And, in so holding, the Supreme Court noted that, while Reynolds had argued that Cugnini (as the seller) never possessed valid title because he failed to comply with the bill of sale laws, "*our holding . . . establishes that noncompliance with such laws does not*

---

[22]  *Id.* (quoting § 35-54-105(1)) (emphasis added).

[23]  *Id.*

[24]  *Id.*

[25]  *Id.* (citations omitted).

*prevent the passage of title under the circumstances of this case.*"[26]   In sum, we read *Cugnini II* to hold that, if *the seller* has valid title (which Murphy insists he did), he can pass valid title to a buyer (who can then grant a lien) without fully complying with the bill of sale laws, if the UCC requirements are met.

A ruling in favor of Murphy based on defects in the Bill of Sale would be especially inappropriate here, since it was he who signed the Bill of Sale and delivered it along with the cattle, but did not, *e.g.*, include his address.  The technical defects in the Bill of Sale do not affect what is obvious, which is that Murphy signed a document transferring ownership of the cattle to Leonard, such that others could reasonably rely on Leonard's claim of ownership.

Murphy cites *Moffatt County State Bank v. Producers Livestock Marketing Association*,[27] which, as Murphy points out, said, "[T]he livestock bill of sale laws govern passage of *title* in livestock.  The livestock bill of sale laws supplement *Article 2* of the U.C.C. as codified in Colorado, Colo. Rev. Stat. § 4-2-101 *et seq.*, and, to the extent they are inconsistent with Article 2, supercede it."[28]   Despite *Cugnini II*, Murphy asserts that the bill of sale laws are inconsistent with Article 2 as it relates to the passage of title and, therefore, control.

However, Murphy takes this quote out of context, and extends it too far.  In that case, Moffat County State Bank asserted a security interest in cattle owned by a man named Seewald.  Seewald had sent the cattle to a livestock sale barn,

---

[26]    *Id.* at 966, n. 7.

[27]    598 F.Supp. 1562 (D. Colo. 1984).

[28]    *Id.* at 1567 (emphasis in original).

Producers Livestock Marketing, to be sold.  Producers sold the cattle and, unaware of the Bank's lien, remitted the proceeds to Seewald rather than to the Bank.  The Bank sued Producers to recover the proceeds.  The expressly-stated issues in that case were:  (A) whether the Bank perfected a security interest in the cattle sold by Producers; and (B) whether the Bank authorized the sale of cattle and thus lost its security interest in the collateral under Article 9 of the UCC.[29]

There was no dispute in *Moffat* as to *who held title* to the cattle at issue.  Seewald (the borrower) did.  Rather, the issue was whether the Bank had properly perfected its lien in the cattle.  Producers had asserted that, in order for the Bank's security agreement to "reasonably identify" the cattle under Article 9 of the UCC, it had to meet the requirements of the livestock bill of sale laws.  Since the Bank's security agreements' description of the cattle was more vague than that required under the bill of sale law, Producers asserted that the Bank's lien was not perfected.  Rejecting that argument, the Court in *Moffat* simply held that the specificity required under the livestock bill of sale laws was not required under Article 9.  The passage Murphy quotes from the case concerning the bill of sale law and Article 2 merely pointed out that the livestock bill of sale laws relate to the transfer of title, whereas Article 9 relates to the perfection of a security interest.  And, although the Court did say that the livestock bill of sale laws supercede Article 2 to the extent the two laws are inconsistent, the Court did not hold that the livestock bill of sale laws are, in fact, inconsistent with Article 2.  Nor did *Moffat* hold that the livestock bill of sale law is the *exclusive* method in Colorado for transferring title to cattle.  Indeed, as discussed above, *Cugnini II* holds directly to the contrary.  Therefore, despite Murphy's quoted passage, *Moffat* does not stand

---

[29]  *Id.* at 1565.

16

for the proposition that Article 2 is inapplicable here as to the passage of title, and the Bankruptcy Court did not err in turning to Article 2 of the UCC.

## III. Transfer of Title Under the Uniform Commercial Code

The Bankruptcy Court held that title passed to Leonard pursuant to § 2-401 of the UCC.  That statute provides, in relevant part:

**§ 2-401. Passing of title; reservation for security; limited application of this section**

Each provision of this article with regard to the rights, obligations, and remedies of the seller, the buyer, purchasers, or other third parties applies irrespective of title to the goods except where the provision refers to such title. Insofar as situations are not covered by the other provisions of this article and matters concerning title become material the following rules apply:

(1) Title to goods cannot pass under a contract for sale prior to their identification to the contract (section 2-501), and unless otherwise explicitly agreed the buyer acquires by their identification a special property as limited by the Uniform Commercial Code.  Any retention or reservation by the seller of the title (property) in goods shipped or delivered to the buyer is limited in effect to a reservation of a security interest.  Subject to these provisions and to the provisions of the Article on Secured Transactions (Article 9), *title to goods passes from the seller to the buyer in any manner and on any conditions explicitly agreed on by the parties.*

(2) *Unless otherwise explicitly agreed title passes to the buyer at the time and place at which the seller completes performance with reference to the physical delivery of the goods, despite any reservation of a security interest and even though a document of title is to be delivered at a different time or place*; and in particular and despite any reservation of a security interest by the bill of lading

17

> (a) *if the contract requires or authorizes the seller to send the goods to the buyer but does not require him or her to deliver them at destination, title passes to the buyer at the time and place of shipment . . . .*[30]

Here, it is undisputed that Murphy surrendered possession of the cattle to Leonard at the time of shipment in Colorado, signed a bill of sale transferring title to Leonard, and that the Murphy/Leonard contract contained no reservation of title or security interest. Therefore, pursuant to § 2-401, title passed to Leonard at the moment the cattle were shipped. That title was voidable due to Murphy's reclamation rights but, as will be seen, voidable title is sufficient to support the grant of a security interest. Indeed, although the cattle were in fact accompanied by the Certificate / Bill of Sale in this case (albeit not in full compliance with the livestock bill of sale laws, discussed above), such title would have passed to Leonard at the time of shipping, "even [if] a document of title [was] to be delivered at a different time or place." Further, § 2-401 "does not provide for a revesting of title for nonpayment of the purchase price alone, unless the contract of sale so provides."[31] The contract of sale here did not so provide, and so Murphy's right to have title re-vest in him when the checks were dishonored was limited to his reclamation rights.

---

[30] Neb. Rev. Stat. U.C.C. § 2-401 (emphasis added).

[31] *Maryott v. Oconto Cattle Co.*, 607 N.W.2d 820, 826 (Neb. 2000).

# IV. Attachment of Sweetwater's Security Interest

# Upon Transfer of Title to Leonard

Section 2-403 of the UCC provides:

**§ 2-403. Power to transfer; good faith purchase of goods; entrusting**

(1) A purchaser of goods acquires all title which his or her transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. *A person with voidable title has power to transfer a good title to a good faith purchaser for value.* When goods have been delivered under a transaction of purchase the purchaser has such power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) *the delivery was in exchange for a check which is later dishonored*, or

(c) it was agreed that the transaction was to be a "cash sale", or

(d) *the delivery was procured through fraud* punishable as larcenous under the criminal law.[32]

Under this section, when Leonard received title (*albeit* voidable title) from Murphy at the time of shipping, he received all the title Murphy had, as well as the power to transfer good title to a good faith purchaser for value. That is true, despite the fact that "the delivery was in exchange for a check which [was] later dishonored," or was, as Murphy asserts, "procured through fraud."[33]

---

[32] Neb. Rev. Stat. U.C.C. § 2-403 (emphasis added).

[33] Neb. Rev. Stat. § 2-403(1)(b) and (d).

We note that Colorado's version of § 2-403 contains the following provision, which is not in Nebraska's, but emphasizes that it was Murphy who was best in the position to protect himself here:

> (1.5) Notwithstanding any other provision of this section, when livestock have been delivered under a transaction of purchase and on the accompanying brand inspection certificate or memorandum of brand inspection certificate the *seller has conspicuously noted that payment of the consideration for the transaction has not been received*, the buyer does not have power to transfer good title to a good faith purchaser for value until payment is made.[34]

Hence, not only could Murphy have refused to sign the bill of sale until he was paid, he could have conspicuously noted on the inspection certificate that payment had not been tendered and that Leonard did not have power to transfer good title. In *Maryott v. Oconto Cattle Co.*,[35] the Nebraska Supreme Court held that, under § 2-403, "[t]he U.C.C. allows a buyer who has not paid for goods to transfer greater title to a good faith purchaser than he or she can claim."[36] A secured creditor of a buyer can be considered to be a good faith purchaser under these provisions.[37] "We

---

[34] Colo. Rev. Stat, § 4-2-403(1.5) (emphasis added). Similarly, § 2-401 of Colorado's UCC contains the following provision, which is absent from Nebraska's: "Notwithstanding any other provision of this section, when livestock have been delivered under a contract of sale, if on the accompanying brand inspection certificate or memorandum of brand inspection certificate the seller has conspicuously noted that payment of the consideration for the sale has not been received, title does not pass until payment is made." Colo. Rev. Stat. § 4-2-401(5).

[35] 607 N.W.2d 820 (Neb. 2000).

[36] *Id.* at 827.

[37] *Id.* ("[T]he definition of 'purchaser' found in the U.C.C. is broad and

have held that between an unpaid seller and a secured party who qualifies as a good faith purchaser, the secured party has priority."[38]

Murphy asserts that the Bankruptcy Court erred in relying on *Maryott v. Oconto Cattle* in concluding that Sweetwater's lien attached to the cattle. In that case, Maryott regularly sold cattle to Oconto. Oconto's lender had a security interest in Oconto's after-acquired cattle. Oconto had been habitually slow to pay Maryott, but always paid within three weeks after delivery. On the last transaction, Maryott had delivered cattle to Oconto, but Oconto's payment drafts on those cattle were dishonored. As here, Oconto's lender claimed a security interest in the cattle under its after-acquired collateral provision. In Maryott's replevin action, Maryott claimed that, pursuant to industry standards, title did not pass until the seller had been paid. The Court there assumed that the seller had expressly reserved title in the cattle, which, under § 2-401, was limited to the reservation of a security interest subject to the provisions of Article 9.[39] Hence, the issues there were whether the lender's security interest attached to the cattle and whether that interest had priority over Maryott's "unperfected security interest"[40] as an unpaid seller with a reserved security interest. The Court held that the lender's lien attached to the cattle because it established that it was a good faith purchaser under § 2-403, and, therefore, it prevailed over Maryott's unperfected interest.

includes persons taking by mortgage, pledge, or lien.").

[38]
*Id.* at 827-28 (citing *Jordan v. Butler*, 156 N.W.2d 778 (1968)).

[39]
*Id.* at 826.

[40]
*Id.*

Murphy attempts to distinguish *Maryott* on the ground that his interest in the cattle here is a reclamation right, as opposed to a reservation-of-right unperfected security interest as was the case in *Maryott*. We agree with Murphy that his rights in the cattle here are reclamation rights as opposed to an unperfected security interest,[41] but since we have concluded that Murphy's title passed to Leonard at the time of shipping, and Leonard could pass good title to a good faith purchaser under § 2-403, the issues here are the same as in *Maryott*: Namely, was Sweetwater a good faith purchaser under the UCC and, if so, does its lien has priority over Murphy's reclamation rights?

On the question of whether Sweetwater was a good faith purchaser, Murphy asserts that the Bankruptcy Court used the wrong standard. Specifically, Murphy asserts that the Court should have found Leonard was a "merchant" under the UCC and used the UCC's higher standard for good faith for such merchants. As relevant here, "merchant" is defined in Article 2 as "a person who deals in goods of the kind. . . ."[42] Livestock are "goods" under the UCC.[43] "'Good faith' in the case

---

[41] *See Rowse v. Platte Valley Livestock, Inc.*, 604 F.Supp. 1463, 1467-68 (D. Neb. 1985) ("The right to reclaim created by UCC § 2-507(2) is a right to undo the transaction, not a right to secure payment of the price as required by the definition of security interest."); *Matter of PFA Farmers Market Assoc.*, 583 F.2d 992, 998 (8th Cir. 1978) ("Sellers have never understood their reclamation right to be a security interest.").

[42] Neb. Rev. Stat. U.C.C. § 2-104(1).

[43] *Cugnini I*, 648 P.2d at 163.

of a merchant means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade.'"[44]

Murphy is correct that the Bankruptcy Court did not expressly find that Sweetwater was a merchant. That said, Sweetwater does not seem to assert it was *not* a merchant who deals in cattle and it would in fact appear that Sweetwater is such a merchant. We thus agree with Murphy that the "honesty in fact" and "reasonable commercial standards" apply. Murphy does not expressly assert, nor did the record support an assertion, that Sweetwater acted dishonestly. Rather, Murphy's good faith argument turns on whether Sweetwater observed reasonable commercial standards in releasing the funds to Leonard without first ascertaining that Leonard owned the cattle.

On the question of "reasonable commercial standards of fair dealing in the trade," Murphy asserts that the Bankruptcy Court made findings of disputed fact which were not supported by the summary judgment record. Specifically, Murphy asserts that the Court erroneously "found" that (i) that cattlemen generally consider the Certificate / Bill of Sale in this case to be valid documentation of ownership; and (ii) that Sweetwater had seen the Certificate / Bill of Sale prior to releasing the funds to Leonard.

As state above, the question on summary judgment is whether there was a "genuine dispute" as to any "material fact."[45] The burden on the moving party "is only to demonstrate, *i.e.,* to point out . . . , that the record does not disclose a

---

[44] Neb. Rev. Stat. U.C.C. § 2-103(1)(b).

[45] Fed. R. Civ. P. 56(a).

genuine dispute on a material fact."[46]  The non-moving party then must set forth specific facts showing a genuine issue of material fact for trial.[47]  "A fact is material if it might affect the outcome of the suit, and a dispute is genuine if the evidence is such that it could lead a reasonable jury to return a verdict for either party."[48]  "A court considering a motion for summary judgment must view the facts in the light most favorable to the non-moving party and give that party the benefit of all reasonable inferences that may be drawn from those facts."[49]  The bankruptcy court is not to weigh evidence and make credibility determinations, or to attempt to determine the truth of the matter, but is, rather, solely to determine whether there is a genuine issue of fact for trial.[50]

On the question of whether cattlemen generally consider the Certificate / Bill of Sale as valid documentation of ownership, Sweetwater produced an Affidavit of

---

[46]

*City of Mt. Pleasant, Iowa v. Assoc. Elec. Cooperative, Inc.*, 838 F.2d 268, 273 (8th Cir. 1988) (internal quote marks and brackets omitted).

[47]

*Dico, Inc. v. Amoco Oil Co.*, 340 F.3d 525, 529 (8th Cir. 2003).  *See also Brunsting v. Lutsen Mountains Corp.*, 601 F.3d 813, 820 (8th Cir. 2010) (holding that the non-movant may not rest upon mere allegations of denials in its pleadings, but must adduce sufficient admissible evidence to create a genuine issue of material fact in order to avoid summary judgment).

[48]

*U.S. Bank Nat=l Assoc. v. U.S. Rent a Car, Inc.*, 2011 WL 3648225 at *3 (D. Minn. Aug. 17, 2011) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

[49]

*Id.* (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 578 (1986)).

[50]

*Williams v. Marlar* (*In re Marlar*), 252 B.R. 743, 750 (B.A.P. 8th Cir. 2000) (citations omitted).

Gerald Timmerman, a longtime, third-generation rancher who also operates a feedlot business which provides secured financing to his customers who are feeding with him (much like Sweetwater). Mr. Timmerman stated that, when he extends such financing, he reviews a bill of sale only to determine if the names of the seller and buyer are disclosed, the date of the transaction is shown, there is a description of the cattle sold, and it is signed by the seller.[51] He states that he reviewed the Certificate / Bill of Sale at issue here and would consider it to be a valid bill of sale if it had been presented to him. John Schroeder, who has been involved in the feeding, buying and selling cattle for ten years, filed an affidavit saying he was "not aware of any practice in the cattle industry where a buyer or financing agent checks the laws of the state [where] the cattle came from in order to be sure that the person delivering the cattle complied with brand inspection requirements when a brand officer has signed off on papers authorizing the transfer of the cattle." Similarly, Mike Twitchell, Sweetwater's managing member, submitted an affidavit – *albeit* arguably self-serving – saying that he has been involved in cattle transactions in every state which has brand laws, and that he has "never known of a cattle sale transaction in any state where the Buyer signed a Bill of sale." While Murphy submitted an affidavit which had been the basis for his reclamation claim in state court, he did not submit any affidavit to dispute Sweetwater's evidence as to the documentation cattlemen routinely require to transfer ownership.

---

[51] Mr. Timmerman also said in this affidavit that he had signed a previous affidavit, which had been prepared by Murphy's attorney, in which he had said he would require a bill of sale "that is valid in the state that the livestock transaction took place and that he feedlot review the bill of sale to determine its validity." In the second affidavit, he clarified that he would not check the laws of the state where the livestock transaction took place.

The statements in such affidavits are supported by both law and common sense. As seen, the failure to dot all the i's and cross all the t's on the Colorado Bill of Sale did not affect the transfer of title, since Murphy actually owned the cattle and could therefore transfer title to Leonard under "any manner and on any conditions explicitly agreed on by the parties."[52] That being the law, when Murphy gave a bill of sale signed by him, and witnessed by a state inspector, transferring ownership of the cattle to Leonard, along with possession of the cattle, cattlemen and their lenders would reasonably conclude that he had transferred ownership of such cattle to Leonard.

The cases cited by Murphy do not help his argument. In *Rudiger Charolais Ranches v. Van De Graaf Ranches*,[53] a Washington statute required that any person in possession of livestock not branded with that person's brand is required to also possess certain documentation such as a certificate or permit from the owner of the recorded brand, a brand inspection certificate, or "a bill of sale from the previous owner or other satisfactory proof of ownership."[54] The evidence in that case was that, despite the statute, the industry's customary practice was for the statutorily-required documentation to arrive later by mail, as opposed to accompanying the cattle. The cattle at issue had been delivered to the buyer with very little documentation, and four of the five loads delivered were accompanied by no documentation at all. The court held that failing to require the statutorily-required documentation at delivery was not a reasonable commercial standard, despite the

---

[52] Neb. Rev. Stat. U.C.C. § 2-401(1).

[53] 994 F.2d 670 (9th Cir. 1993).

[54] *Id.* at 672 (citing Wash. Rev. Code. § 16.57.280).

26

fact that it was routine in the industry. Likewise, Murphy asserts, based on this case, that failing to fully abide by Colorado's livestock bill of sale is, as a matter of law, commercially unreasonable.

However, that case is distinguishable because Van De Graaf Ranches, the "merchant" there, had conceded that it had received *no documentation at all* for four of the five loads of cattle at the time of delivery. Significantly, the court in *Van Der Graaf Ranches* pointed out that the documentation statute there was intended to deal with the precise problem presented there, namely, the transfer of branded livestock *without the consent of the rightful owner*.[55] Here, the cattle was delivered to Sweetwater along with a bill of sale and inspection certificate, which had been signed by Murphy and a witness. Thus, when Sweetwater took possession of the cattle, it had reasonable and customary evidence that Murphy had sold the cattle to Leonard and that Leonard was now the rightful owner.

Moreover, as Sweetwater points out, *Van Der Graaf Ranches* applied Washington law and Murphy cites no similar case applying Colorado or Nebraska law. In fact, as discussed in detail above, the Supreme Court of Colorado has held that title may pass without meeting all of the technical requirements under Colorado's livestock bill of sale laws.

Murphy also cites an unpublished opinion from the Colorado Court of Appeals, *Huffman Livestock, LP v. M5 Consulting, LLC*.[56] There, Huffman sold cattle to Smith, who in turn sold the cattle to Mount. Unbeknownst to Huffman,

---

[55]      *Id.* at 673.

[56]      *Case No. 12CA0021 (Colo. Ct. App. Jan. 17, 2013).*

27

Smith was in dire financial straits, and Mount knew it. In fact, Smith and Mount had actually entered a joint venture partnership in which Smith would purchase cattle for the purpose of transferring it to Mount at a discount in forgiveness of debt Smith owed to Mount. When Smith failed to pay Huffman, Huffman sued Mount. Mount asserted he was a buyer in the ordinary course of business entitled to the protections of Article 2.

The standard for good faith for a "buyer in the ordinary course of business" is the same as the one for merchants here: an objective "observance of reasonable commercial standards of fair dealing" and a subjective "honesty in fact."[57] As Murphy points out, the *Huffman* court, relying in part on *Rudiger*, did hold that failing to abide by the statutes, and relying only on handshakes, reputation, and personal relationships in the cattle industry, was not an objectively reasonable standard for good faith.

As distinguished from this case however, the Court in *Huffman* found that Mount and Smith were actual business partners; Mount knew of Smith's financial difficulties; Mount was "heavily involved" in Smith's affairs; Mount helped Smith obtain financing; Mount affirmatively misled Huffman about Smith's financial condition; and Mount received a discount for the cattle in satisfaction of a debt Smith owed him. Under those circumstances, the court found that Mount was not a buyer in the ordinary course and did not act in good faith. In so holding, the *Huffman* court acknowledged that the Supreme Court held in *Cugnini II* that a

---

[57]

  *Id.* at 7-8 and 6, n.8 ("'Good faith' requires (1) 'honesty in fact,' measured subjectively; and (2) 'the observance of reasonable commercial standards of fair dealing,' measured objectively.") (citations omitted). *See also Cugnini II*, 687 P.2d at 967 (discussing the standard for "good faith" for a buyer in the ordinary course).

good faith purchaser prevailed in spite of his failure to comply with the livestock bill of sale law. However, it held that the facts of the case distinguished it from *Cugnini*. Specifically, the court held that observance of commercial standards amounts to good faith if the standards are "reasonably related to achieving fair dealing" in the context of the particular industry in question.[58] In addition, "'fairness' should be 'measured by taking a global view of the underlying transaction and all of its participants.'"[59] Given the facts of that case, where Mount had actually conspired with the buyer to put the seller at risk for his own benefit, the court held that Mount could not be considered a good faith purchaser when considering the global view of the underlying transaction and all of its participants.

Other than the fact that Leonard and Sweetwater had done business together before, and that Leonard and Sweetwater's managing partner were friendly, there is no suggestion in the record that Leonard and Sweetwater conspired in any way to put Murphy at risk of loss. *Huffman* is, therefore, inapposite, and the Bankruptcy Court did not err in concluding that Sweetwater established that it acted in a commercially reasonable manner under the circumstances.

Instead, the facts of *Cugnini*, which *Huffman* had to distinguish, are squarely applicable here. As discussed above, Murphy (like Cugnini) gave Leonard a defective bill of sale along with possession of the cattle, and Leonard (like Russell) gave him bad checks in return. Murphy argues that Sweetwater advanced funds either based on a defective bill of sale to Leonard, or without even inspecting that

---

[58]

    *Id.* at 15-16.

[59]

    *Id.* at 16 (citation omitted).

bill of sale. But the same was so in *Cugnini*, where Reynolds paid for the cattle without first being given a bill of sale. The trial court in *Cugnini* had found that:

> [T]he best practice is to require the production of a brand inspection certificate in connection with a sale of cattle; however the receipt of the brand inspection certificate is sometimes delayed until after receipt of the cattle. Some purchasers refuse to pay for cattle until after the brand certificate is received; however, others, on occasion will pay for cattle before the delivery of a brand inspection certificate and rely on getting it later.[60]

Thus, the fact that Sweetwater advanced funds without first seeing a bill of sale, or saw one which was signed by the seller but not in technical compliance with the bill of sale statute, does not mean that it acted out of the ordinary course, or in a manner which was not commercially reasonable. The same is true here.

As to the factual question of whether Sweetwater saw the Certificate / Bill of Sale before it released funds to Leonard, that would only matter if Murphy had not passed title to Leonard. But he did. Due to Sweetwater's line of credit arrangement with Leonard, the cattle became subject to its lien the moment Leonard became their owner. That was so regardless of whether the money was sent to Leonard before or after that and, indeed, whether Leonard used the loan funds for these particular cattle, or not. Therefore, we conclude, whether Sweetwater wired the funds before, or after, seeing the bill of sale is not a "material" fact because it does not affect the outcome of the suit.

To underscore the difficulty with Murphy's position, assume that he had insisted that he be paid in good funds at the time the cattle were delivered. A lender to Leonard would then have been expected to advance funds without having seen the completed bill of sale and, indeed, without any assurance that possession

---

[60] 687 P.2d at 967.

of the cattle would be transferred.  The purpose of Article 2 of the UCC is to facilitate the free flow of commerce.[61]  That purpose would not be served if lenders were obligated to ascertain that their borrowers have ownership and possession of collateral before funds are lent.[62]

## V. <u>Sweetwater's Request to Strike Murphy's Electronic Record Filing</u>

Murphy filed in this appeal, as part of his electronic record, an Order from a separate adversary proceeding between Leonard and Murphy regarding ownership of the cattle at issue here.  Sweetwater asks that this document be stricken because it is not part of the record in this appeal.   That request is denied.

## VI. <u>Sweetwater's Oral Request for Sanctions</u>

At oral argument, Sweetwater's counsel requested sanctions, arguing that Murphy's appeal was frivolous.  Federal Rule of Bankruptcy Procedure 8020(a) provides that, if the BAP determines that an appeal is frivolous, "it may, after a separately filed motion or notice from the court and reasonable opportunity to respond, award just damages and single or double costs to the appellee."[63]  Since

---

[61] *See Maryott v. Oconto Cattle*, 607 N.W.2d at 827 (Section 2-403's rule that allows a buyer who pays with a dishonored check to pass greater title to a good faith purchaser than the buyer could claim "is designed to promote the greatest range of freedom possible to commercial vendors and purchasers.").

[62] Indeed, this is borne out by Gerald Timmerman's original affidavit, which was submitted by Murphy, and which said that "[t]he bill of sale will usually not be required before the loan proceeds are given to the customer based upon trust in the industry, but is expected to be received within a day or two of receipt of the cattle and funding of the loan." *Declaration of Gerald Timmerman* dated June 9, 2016.

[63] Fed. R. Bankr. P. 8020(a).

Sweetwater did not file a separate motion, nor did Murphy have any opportunity to respond, the oral request for sanctions is denied.

## CONCLUSION

For the foregoing reasons, the Bankruptcy Court's Orders are AFFIRMED. The request by Sweetwater Cattle Company, L.L.C. and Farm Credit Services of America, PCA to strike electronic document is DENIED. Sweetwater Cattle Company, L.L.C.'s oral request for sanctions is DENIED.

———————————————